UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                 :

 UNITED STATES OF AMERICA,                     :     **DECISION AND ORDER**

                               :

                           Plaintiff,       :     08 Cr. 0240 (BMC)

                               :

                 - against -          :

                               :

THOMAS GIOELI, and DINO SARACINO,    :

                               :

                     Defendant.     :
------------------------------------------------------------- X

**COGAN**, District Judge.

Before the Court are defendant Dino Saracino's first motion under Federal Rules of

Criminal Procedure 29 and 33 for a judgment of acquittal or a new trial [1607], and defendants

Thomas Gioeli's and Saracino's second motions for a new trial under Rule 33 [1810, 1816]. The

motions are denied for the reasons stated below.

**I. Saracino's first motion for a new trial and/or acquittal under Rules 29 and 33**

Saracino was convicted on the following five counts of a multi-count indictment: Count

1, racketeering conspiracy in violation of 18 U.S.C. § 1962(d), which included five predicate

acts: murder conspiracy as to members of the Orena faction of the Colombo organized crime

family; extortionate collection of credit as to Peter Risk; murder conspiracy as to Michael

Burnside; extortionate extension of credit conspiracy; and witness tampering as to David

Gordon; Count 5, extortionate extension of credit conspiracy, in violation of 18 U.S.C. § 892(a);

Count 6, prevention of testimony, in violation of 18 U.S.C. § 1512(b)(1); Count 7, withholding

of testimony and records, in violation of 18 U.S.C. § 1512(b)(2)(A); and Count 8, obstruction of

an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).

Saracino argues that the guilty verdicts against him should be reversed, or, alternatively, he should be granted a new trial on the convicted charges, for the following reasons:

1.  There was insufficient evidence to support the charges presented at trial.
2.  Racketeering Act 12 was not "related" to the charged enterprise.
3.  Counts 6 and 8 are duplicative and therefore, the two counts violate defendant's rights under the Double Jeopardy Clause of the Fifth Amendment.
4.  The Court improperly declined to grant him a severance and curtailed his cross examination of government witnesses Calabro and Competiello.

To set aside a jury verdict on the ground that there was insufficient evidence to establish the elements of a criminal offense, a defendant must demonstrate that there was no evidence from which a reasonable mind "'might fairly conclude beyond a reasonable doubt.'" United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993) (citing United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984). A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (quoting United States v. White, 673 F.2d 299, 301 (10th Cir. 1982)).

The burden placed on a defendant to meet these criteria is "very heavy," and courts must "credit every inference that could have been drawn in the government's favor." Id. (citations omitted). The Government need not have "precluded every reasonable hypothesis . . . consistent with innocence." Id. (citation omitted). "Finally, a conviction may be based upon circumstantial evidence and inferences based upon the evidence, and the jury is exclusively responsible for determining a witness' credibility." Id. (citations omitted). In considering a Rule 29 motion, the Court must "review all the evidence presented at trial in the light most favorable to the government crediting every inference that the jury might have drawn in favor of the government." United States v. Walker, 191 F.3d 326, 333 (2d Cir. 1995).

## 1. Sufficiency of the Evidence

### A. The Agreement to Murder Members of the Orena Faction (Racketeering Act 3)

Saracino argues that the Government cannot point to any evidence specifically tying him to a shared intent to murder Orena faction members and that this absence of evidence is fatal to sustaining Racketeering Conspiracy Act 3. He contends that the testimony in support of his guilt is sparse – only one date was provided ("1992") for driving around social clubs looking for Orena Members to kill, and Calabro testified that "our orders were to shoot to kill" but neither he nor anyone else testified that Saracino was present for the issuing of such orders, or the discussion of such orders, or did anything in furtherance of such orders. Saracino further argues that the Government provided examples of Saracino's efforts to locate specific people with Calabro, but that no purpose was elicited for the search.

Calabro's testimony did implicate Saracino. He testified that Gioeli said he needed Calabro, "Richie," "Dino [Saracino]," and "Joey," whenever he was around, to drive him around and drive around with guns. Calabro further testified that "our orders were shoot to kill on the site [sic] if we see any members of the opposite faction," and that Gioeli said he would point them out. Calabro also testified that he and others drove around social clubs, homes, and businesses, with guns, looking for Orena Members; he even specifically testified that he, Gioeli, Dino Saracino and Joey Cave drove by Avenue N Café to locate Joe Scopo, an Orena faction member. Finally, Calabro also testified that Dino Saracino was involved in the attempt to locate and kill an Orena faction member by the name of Bobo. The jury could properly draw the inference that if Saracino was looking for Orena faction members, he was looking for them with the purpose of shooting to kill, as Gioeli ordered.

Having reviewed the evidence presented at trial in the light most favorable to the Government and crediting every inference that the jury might have drawn in favor of the Government, I conclude that there was sufficient evidence to establish that Saracino conspired to murder Orena faction members.

B. A "Taking" to Establish the Alleged Extortionate Extension and Collection of Credit Offenses (alleged in Racketeering Acts 7 and 14, and charged in Count 5)

Saracino argues that the evidence adduced at trial was insufficient to support the jury's findings that he (1) conspired to make an extortionate extension of credit (Racketeering Act 14 and Count 5), and (2) participated in conspiring to collect, and collecting or attempt to collect, an extortionate extension of credit (Racketeering Act 7). He contends that a "gaudy list" of methods of violent debt collection methods and tools were elicited at trial (baseball bats, drills, beatings), but they were attributed to other people (Reynold Maragni), and do not demonstrate that Saracino "took property of another by extortion." Saracino argues that the lack of evidence specifically tying Saracino to a taking warrants an acquittal of these charges.

With respect to Racketeering Act 7 (conspiring/attempting to collect), the Government asserts that the evidence is sufficient to support the jury's finding of guilt. Calabro testified that he directed Saracino and Competiello to collect his loanshark debt from Peter Risk and that "[i]f he don't want to give me my money, break his face off." Calabro further testified that Saracino told Calabro that Saracino had searched for Peter Risk and that Saracino and Competiello "stabbed him." Competiello similarly testified that he and Saracino chased down Peter Risk and stabbed him, while asking Peter Risk why he had not called Calabro back. Additionally, David Gordon testified that Saracino admitted to him that "they went to work on him," meaning "they beat him up, they hit him." The Government submits that this attack was corroborated by hospital records. It is clear that the jury had sufficient evidence to find that Saracino participated

4

in conspiring to collect or attempted to collect an extortionate extension of credit as alleged in Racketeering Act 7.

With respect to Racketeering Act 14 and Count 5, charging Saracino with conspiring to make extortionate extensions of credit, or loansharking, I find that the jury had ample evidence to find guilt. Calabro, Sebastian Saracino and Gordon each testified about the nature and extent of Saracino's loansharking business. Sebastian and Gordon even testified that they assisted Saracino by collecting loanshark payments for him, as did others, such as April Saracino. Gordon testified that if he did not make payments on his loanshark loan, he understood that Saracino would "go to work" on Gordon. Moreover, consensual recordings of defendant and April Saracino, as well as the loanshark ledger admitted into evidence, corroborate witness testimony.

C. Witness Tampering as to David Gordon (Racketeering Acts 16 and Counts 6, 7 and 8)

In early 2008, the Government, in an effort to conduct an investigation of the affairs of the Colombo crime family, served numerous subpoenas on Saracino's associates, including on Gordon. The Government alleged at trial that Saracino obstructed its investigation. Saracino was charged with Racketeering Act 16 (witness tampering of David Gordon), Count 6 (prevention of testimony), Count 7 (withholding of testimony and records), and Count 8 (obstruction of an official proceeding), all of which relate to Gordon and the Grand Jury subpoenas issued in 2008 for photographs, fingerprints, documents and testimony relating to the Colombo family.

Saracino claims that the record shows that he never attempted to influence, delay, or prevent Gordon from giving testimony or evidence, or complying with the terms of the subpoena. Saracino argues that he told Gordon that he must go to the grand jury and surrender

the videotape and that he should "take the Fifth" when he does appear before the grand jury. However, his suggestion to Gordon to take the Fifth, according to Saracino, was an effort to protect Gordon, an unrepentant drug addict, thief, and liar; it was not an attempt to persuade Gordon to withhold inculpatory information from the Government.

Gordon testified at trial that Saracino told him that Gordon "would be taking the Fifth," which Gordon understood to mean that he had "no choice" but to plead the Fifth Amendment," and that he should "[n]ot . . . answer any of the questions of the subpoena at the grand jury." Viewing Gordon's testimony in the light most favorable to the Government, the jury could reasonably find that Saracino told Gordon to plead the Fifth with the improper purpose of ensuring that Gordon would not implicate Saracino before the grand jury. Although the fact that Saracino urged Gordon to surrender the subpoenaed videotape certainly helps Saracino's argument, the mitigating effect of that act is diminished by other facts, such as the fact that Saracino told Gordon he wanted to see the wedding album that was subpoenaed. There was therefore sufficient evidence to support the guilty verdicts.

**2. Whether the Conspiracy to Murder Michael Burnside was Related to the Enterprise**

Saracino argues that Racketeering Act 12, the predicate act of conspiracy to murder Burnside, was not related to the enterprise, and therefore, he should be acquitted of this predicate act. Under the RICO statute, the Government bears the burden of proving relatedness. According to Saracino, the evidence demonstrated that he plotted to murder Burnside "to exact revenge on Burnside for the death of [his brother] Frank Saracino," and had nothing to do with the goals of the Colombo family.

The Second Circuit has held that the fact that a defendant commits a crime to further his own agenda does not destroy the vertical relatedness required by the RICO statute, if indeed he

was only able to commit the crime by virtue of his position within the enterprise. See United States v. Locascio, 6 F.3d 924 (2d Cir. 1993). I find that a rational jury could have concluded, as it did, that Saracino was able to participate in the conspiracy to murder Burnside by virtue of his position in the enterprise. He used the other members of the crew, namely Calabro and Competiello, to execute the plan, and the jury could have inferred that without Calabro and Competiello, Saracino could not have successfully completed the job.

### 3. Whether the two Witness Tampering Counts are Multiplicitous

Saracino contends that Count 7, which charged a violation of 18 U.S.C. § 1512(b)(2), and Count 8, which charged a violation of 18 U.S.C. § 1512(c)(2), are multiplicitous, and that the Court should enter a judgment of acquittal for Count 8. The argument is without merit.

Section 1512(b)(2) punishes anyone who "corruptly persuades another person, or attempts to do so, or engages in misleading conduct towards another person, with intent to . . . cause or induce any person to . . . withhold testimony, or withhold a record, document, or other objection, from an official proceeding." Count 7 (and Racketeering Act 16b) of the Superseding Indictment states that "[i]n or about and between February 2008 and May 2008 . . . [Saracino], together with others, did knowingly, intentionally and corruptly attempt to persuade, and engage in misleading conduct toward, David Gordon, with intent to cause and induce David Gordon to withhold testimony, records, documents, and other objects from an official proceeding, to wit: the grand jury.

Section 1512(c)(2) punishes anyone who "corruptly . . . otherwise obstructs, influences, or impedes an official proceeding, or attempts to do so." Count 8 (and Racketeering Act 16c) of the Superseding Indictment states that "[i]n or about and between February 2008 and May 2008

7

. . . [Saracino], together with others, did knowingly and intentionally attempt to corruptly

obstruct, influence and impede an official proceeding, to wit: the grand jury."

An indictment is multiplicitous "when it charges a single offense multiple times, in

separate counts when, in law and fact, only one crime has been committed." United States v.

Chacko, 169 F.3d 140, 145 (2d Cir. 1999). "It is not determinative whether the same conduct

underlies the counts; rather, it is critical whether the "offense" – in the legal sense, as defined by

Congress – complained of in one count is the same as that charged in another." Id. at 146; see

also Bellomo v. United States, 263 F. Supp. 2d 561, 567-68 (E.D.N.Y. 2003) (determining that

two counts did not violate the Double Jeopardy Clause even though the two charges were based

on the same conduct, because each charge contained an element the other did not contain).

Defendant claims that he is being charged twice for the same behavior – corruptly

influencing Gordon not to testify before one single grand jury – and that his dual punishment for

one offense is in violation of the Double Jeopardy Clause of the Fifth Amendment. It is clear

that in light of the Second Circuit's guidelines in Chacko, it is simply not enough for Saracino to

claim that the same conduct underlies the two counts. Counts 7 and 8 reveal that each does not

charge the same act or transaction. Count 7 charges conduct aimed at obstructing another person

from testifying at an official proceeding, while count 8 charges obstruction of the official

proceeding itself. Each contains an element the other does not and therefore, counts 7 and 8 (and

Racketeering Acts 16b and 16c) are not multiplicitous.

**4. Whether the Court Improperly Declined to Grant a Severance and Curtailed
Saracino's Cross-Examination of Government Witnesses**

Saracino argues that he is entitled to a new trial based on the Court's denial of his pre-

trial motion for a severance and that a severance would have prevented several wrongs which

occurred as a result of the joint trial of Saracino and Gioeli. Had the Court granted a severance,

Saracino would not have been subjected to "spillover prejudice," from Gioeli, and Saracino would have had the opportunity to meaningfully cross-examine the cooperating witnesses who testified against him.  The Court rejects this argument.

As an initial matter, the Court notes that there is a strong preference for joint trials in the federal system, see United States v. Bin Laden, 109 F.Supp.2d 211, 214 (S.D.N.Y. 2000), and that the standard of review of the denial of a motion for severance is abuse of the trial court's discretion, which is an "extremely difficult burden,"  requiring a defendant to show that the denial of the motion caused him "substantial prejudice" so great as to deny him a fair trial. United States v. Cardascia, 951 F.2d 474, 482 (2d Cir. 1991).  The Second Circuit held that when codefendants present antagonistic defenses that are so irreconcilable as to be mutually exclusive, the failure to grant severance amounts to the unconstitutional denial of a fair trial.  To make a showing of mutually antagonistic defenses, the defendant must make a factual demonstration that acceptance of "one defense requires that the jury must of necessity convict a second defendant." United States v. Yousef, 327 F.3d 56, 151 (2d Cir. 2003).

Saracino argues that the Court's denial of severance caused him substantial prejudice because Gioeli was alleged to have been a "capo" and "acting boss" of the Colombo family while Saracino was nothing more than a "foot soldier."  Therefore, Saracino contends that Gioeli had every incentive to portray Saracino in a negative light for the purpose of making Gioeli look less culpable.  Moreover, Saracino argues that Gioeli and Saracino presented conflicting defenses – Gioeli argued that the Colombo family did not exist, while Saracino conceded its existence but not his participation in its endeavors.  Additionally, Saracino complains that the "prior bad acts" of both defendants were allowed in, but the bulk of the bad acts related to Gioeli and not to Saracino.  Finally, Saracino provides, as an example of the substantial prejudice he experienced

as a result of the Court's unwillingness to sever the two cases, the fact that while Saracino denied

participating in the murder of Greaves, Gioeli testified that Greaves was in fact murdered and

that Saracino was present.

I do not find defendants' conflicting defenses or alleged bad acts of Gioeli admitted at

trial sufficient to show that a jury was led to convict Saracino over Gioeli. The jury was clearly

able to assess defendants' respective defenses. Saracino argues that Gioeli presented evidence

through the testimony of another witness that Richard Greaves was murdered and that Saracino

was present at the murder, along with other members of the Colombo crime family. This

argument makes little sense since the jury acquitted both Saracino and Gioeli of the conspiracy

to murder Greaves. Saracino cannot complain that Gioeli's defense to the Greaves murder – that

Saracino was present at the Greaves murder – made it necessary for the jury to convict Saracino,

since Saracino was acquitted of that charge.

Saracino argues that even though both he and Gioeli were eventually cleared of any

participation in Greaves' alleged murder, the implication that Saracino was present and an active

participant in the Colombo family's criminal endeavors was clearly conveyed to the jury, and

"almost certainly" led to Saracino's RICO and obstruction convictions. I do not find this

argument to have any merit. There was ample evidence showing that Saracino was a participant

in some of the Colombo family criminal endeavors, and I believe the jury was able to draw its

own conclusion as to Saracino's guilt, independent of its decision as to Gioeli's guilt.

Saracino argues that during the trial, counsel for Gioeli questioned a witness in such a

way as to suggest that Gioeli was waiving the attorney-client privilege that attached during a

"joint defense" meeting. He complains that the Court issued an oral order blocking this line of

inquiry and referring to "the defendants" when warning them that "they" should not have

attempted this line of questioning without giving you advance notice of "their" intention to do so. According to Saracino, this single incident is proof that the Court, and presumably the jury, mistakenly perceived Saracino and Gioeli as parties to a "joint defense." I am not convinced that this single incident prejudiced Saracino in any way. Even if there was evidence of some prejudice, it would still not be enough to warrant a new trial under the stringent standard of Rule 33, where a new trial may be granted only when "it would be a manifest injustice" to let Saracino's guilty verdict stand. United States v. Stahl, 337 Fed. Appx. 31, 33 (quoting United States v. Guang, 511 F.3d 110, 119 (2d Cir. 1997)).

Finally, Saracino argues that he was prevented from meaningfully cross-examining two of the most important cooperating witnesses against him, Calabro and Competiello, in violation of his right of confrontation. It appears that Saracino's claim is based solely on the fact that the Court granted the Government's motion in limine to preclude, pursuant to Federal Rule of Evidence 608(b), the introduction of any extrinsic evidence of Calabro and Competiello's purported participation in the murder of Dino Saracino's brother, Frankie. Saracino argues that the Court's ruling on the motion *in limine* deprived him of the opportunity to impeach the Government's witnesses with regard to Frank Saracino's murder and the ability to show Calabro's and Competiello's conspiracy against the Saracinos, and thus a motive to lie.

First, I find that Saracino, in fact, extensively cross examined both Competiello and Calabro about the murder of Frank Saracino and the conspiracy to murder Michael Burnside, notwithstanding my ruling on the Government's motion *in limine* to preclude extrinsic evidence of the murder. Second, as I found when ruling on the motion in *limine,* the murder of Frank Saracino was a collateral matter. Saracino argues that Competiello "convinced" Saracino that Burnside was responsible for the murder of Frank Saracino, and that makes the Frank Saracino

murder central to the charged crimes. I agree with the Government that even if there were evidence to support this claim, this does not transform the Frank Saracino murder into a non-collateral matter.

Finally, Saracino complains that he was unable to cross-examine Calabro about information that the Government disclosed in its production of *Giglio* materials following the completion of Calabro's testimony. The Court had offered Saracino an opportunity to recall Calabro to reopen his cross-examination, but Saracino declined to do so. Thus, he had the chance to "meaningfully cross-examine" Calabro with the new materials and, therefore, there can be no finding of a violation of Saracino's confrontation right.

## II. Gioeli's and Saracino's Second Motions to Set Aside Their Verdicts

Defendants' second motions are based on evidence that was newly discovered by the Government and recently turned over to defendants. The newly discovered evidence consists of the following: (1) recorded conversations between a confidential source ("CS") and James Calderone that took place on May 10, 2012, and draft transcripts of the relevant portions of the recordings; and (2) a redacted copy of handwritten notes by Drug Enforcement Administration ("DEA") agents documenting interviews dated January 26, 2012, February 9, 2012, March 19, 2012, June 7, 2012, August 23, 2012, September 5, 2012 and April 17, 2013 of the confidential source.

Defendants focus on (1) the notes from the January 26, 2012 interview which reveal that the CS proffered to Joseph Competiello stabbing John Eves with a fork; (2) the notes from the February 9, 2012 interview with the CS which contain references to the murder of Richie Greaves, including the fact that he was "killed in Joey Caves house"; (3) notes from the March 19, 2012 interview with the CS which reveal that the CS, in discussing Calderone, referenced

"talk about Chestnut," and also referenced "McLaughlin, [and] Greaves," and that someone "threw rag at [Marasa's] mother"; and (4) the May 10, 2012 recording of conversations between the CS and Calderone which contain discussions about the murder of Frank "Chestnut" Marasa. Specifically, the recording reveals that Calderone says he, "Big Dino," and "Tommy" were present for the Marasa "Chestnut" hit but Calderone says he "was only there for, but didn't do" the murder. During this conversation, Calderone accuses the CS of wearing a wire. The Court notes that the March 19, 2012 interview took place on the same day as opening statements at trial and that the May 10, 2012 recording of the conversation between the CS and Calderone took place the day after the jury returned its verdict.

Defendants make several arguments in support of their motions. The Court's rulings are as follows:

1.      Gioeli and Saracino argue that their guilty verdicts should be vacated on the ground that non-disclosure of the newly discovered evidence constituted a violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). Specifically, Saracino claims that the Government committed a *Brady* violation when it failed to disclose the CS's statements that the Greaves murder occurred in Competiello's residence, not Saracino's residence. In addition, Gioeli and Saracino both claim that the Government committed a *Brady* violation by failing to disclose Calderone's statements to the CS about the Marasa murder.

A new trial is warranted if the Government committed a *Brady* violation. To establish a *Brady* violation, "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the [government], either willfully or inadvertently; and [3] prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

The Court finds that the evidence is favorable to both defendants because it is impeaching. Next, defendants argue that because one or more prosecutors were present at one or more of the three pre-verdict interviews with the CS at issue, the knowledge of those prosecutors and/or DEA agents must be imputed to the Government. The Court need not reach the issue of whether there was either willful or inadvertent suppression because the last prong of the test, whether prejudice ensued, is unmet.

Prejudice occurs if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." United States v. Mahaffy, 693 F.3d 113, 127 (2d Cir. 2012) (citation and internal quotation marks omitted). First, no prejudice ensued as a result of the non-disclosure of the January 26, 2012 notes. At best, the information that Joey Caves stabbed John Eves with a fork is cumulative impeachment material, if anything.

Second, no prejudice ensued as a result of the non-disclosure of the February 9, 2012 interview notes. At trial, Calabro, Competiello and Sebastian Saracino testified that Saracino shot Greaves with a .38 caliber gun in Saracino's basement in Gioeli's presence. They also testified that they cleaned up the murder scene, transported Greaves' body and brought Greaves' jeep to a location near the Verrazano bridge. Thus, in light of the evidence adduced at trial, the CS's statement that the murder occurred in Competiello's residence amounts only to cumulative impeachment material.

Moreover, the Government's witnesses were thoroughly cross-examined by defense counsel and the jury had a full opportunity to assess the credibility of those witnesses. The jury and I heard cross-examination that went on not for hours, but for days. The witnesses were vigorously and effectively impeached for having committed numerous, heinous acts of violence

and deception, and defense counsel bannered every big and small inconsistency within and between their testimonies and all of the other evidence. The cooperating witnesses' obvious interest in escaping a potential death penalty was stressed to the jury. It is also clear from the verdict that the jury took note of defendants' efforts to discredit the witnesses and found the witnesses' testimony unpersuasive as to a number of the charged crimes. To say that this one, second hand allegation of one detail as to where the murder occurred would have "tipped the balance" and resulted in an acquittal on the remaining charges is to attribute to this information a level of importance that it could have never had at trial in light of the enormity of the impeachment evidence that defendants marshaled.[1] The information does not undermine confidence in the verdict in any way.

Finally, the Court turns to Calderone's statements to the CS about the Marasa murder as reflected in the notes from the March 19, 2012 DEA interview with the CS, and the May 10, 2012 recording of conversations between the CS and Calderone. The Court finds that defendants cannot establish that the information found in either of these materials could be reasonably taken to "put the whole case in such a different light as to undermine the confidence in the verdict." Mahaffy, 693 F.3d at 127.

First of all, the information found in the May 10, 2012 recording is of very dubious quality as evidence. You have a potentially connected witness who knows, or at least suspects, that he is being taped by the CS. (We know this because he in fact says so.) He manages to drop this little "nugget" in his conversation with the CS which carefully manages to avoid implicating

---

[1] Another compelling reason to find that this evidence does not undermine confidence in the verdict is the fact that defendants had in their possession information provided by Anthony Basile that Greaves was murdered in an autobody business owned by Calabro. Although Saracino argues that his strategic decision not to employ this information is of no relevance, the Court finds that defendants' failure to use the information provided by Basile indicates the minimal impeachment value of the newly discovered evidence.

himself. Furthermore, the conversation took place the day after the jury rendered its verdict. Even if it took place during or before trial began, it would add, at best, an additional pebble to the mountain of impeachment material that defendants put before the jury.

Similarly, the March 19, 2012 DEA interview notes with the CS appear to be of minimal value. The notes reveal that the CS, in discussing Calderone, referenced "talk about Chestnut," and also referenced "McLaughlin, [and] Greaves," and that someone "threw rag at [Marasa's] mother." Defendants describe this as evidence of the murder, but looking at the note on the day the statement was made – March 19, 2012 – there was no reason that any prosecutor would have reasonably thought that was the case. Not every mention of Marasa was necessarily tied to his murder, and nothing in this statement connects it to the murder. The Court finds that these notes do not even qualify as impeachment material as to the Government's witnesses.

Gioeli claims that Calderone's claim that he was present for the Marasa murder changes the participants who were involved in the murder and shows that "Gioeli did not preside over this conspiracy." According to Gioeli, the revelation of two additional participants in the murder, Calderone and Competiello, neither of whom were mentioned by Calabro at trial, directly refutes Calabro's account of this murder conspiracy. In addition, Gioeli argues that the fact that these two additional participants were "Bay Parkway Boys" directly supports his version of the murder as a revenge killing planned and orchestrated by the Bay Parkway Boys and unrelated to Gioeli. I find that Calderone's statements, at best, constitute impeachment material as to Calabro and Competiello, but as noted above, defendants had ample opportunity to cross-examine and impeach these witnesses in front of the jury. Due to the dubious nature of the recorded conversation, I do not find that it would have added any support to Gioeli's defense theory or

16

that it could be reasonably taken to "put the whole case in such a different light as to undermine the confidence in the verdict." Mahaffy, 693 F.3d at 127.

2.     Gioeli moves, in the alternative, for an evidentiary hearing to assess the facts regarding the timing of the disclosure of the information at issue in the motion, and for discovery related to the same. This motion is denied. Gioeli has failed to demonstrate a basis for questioning the Government's submission that it did not have knowledge of any of the impeachment material at issue prior to the conclusion of the trial and therefore the motion for a hearing is denied. The request for discovery is also denied as having no basis; the Government has submitted that the newly discovered evidence contains all of the discovery it is obligated to produce and this Court has no reason believe that the Government is dissembling.

3.     Saracino moves to require the Government to submit, either to defense counsel, or at least *in camera*, all the materials in the possession of the United States of America which relate in any way to the crimes alleged in the indictment under which Saracino was tried. The Court finds that the Government has satisfied its obligations and thus the request is denied. Moreover, the Court has reviewed the materials submitted *in camera* and finds that the Government's redactions were appropriate.

4.     Gioeli and Saracino both argue that Rule 33 provides for the granting of a new trial if newly discovered evidence is produced after a guilty verdict and if the interests of justice so require. The argument is without merit. None of the newly discovered evidence would likely have resulted in an acquittal. Rather, as discussed above, the evidence is at most impeachment material which was not even sufficient to meet the standard of prejudice for a *Brady* violation. The newly discovered evidence thus cannot meet the higher standard required for a new trial.

5.    Finally, Saracino argues, citing <u>United States v. Josephberg</u>, 562 F.3d 478, 494 (2d Cir. 2009), that he is entitled to a new trial because the new evidence demonstrates that the Government failed to disclose and correct Competiello's and Calabro's perjury at trial.  The testimony that Saracino characterizes as "perjury" is the two witnesses' testimony that the murder of Richard Greaves took place in the Saracino basement, rather than in the Competiello household as their CS told the Government before trial.  The handwritten notes by a DEA agent that according to the CS, Greaves was killed in Competiello's house is not evidence that the witnesses perjured themselves or even that they were inconsistent in their testimony.  The CS could well have been lying or mistaken, and the witnesses could have been telling the truth.  This argument is without merit.

**SO ORDERED.**

_____
U.S.D.J.

Dated:  Brooklyn, New York
       October 1, 2013